UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JASON LEE SUTTON,

                                    Plaintiff,

        v.

STEPHEN SINCLAIR, *et al.*,

                                    Defendants.

Case No. C19-1119-BJR-MLP

REPORT AND RECOMMENDATION

## I.    INTRODUCTION AND SUMMARY CONCLUSION

This is a civil rights action proceeding under 42 U.S.C. § 1983. Plaintiff Jason Sutton is currently confined at the Monroe Correctional Complex ("MCC") - Washington State Reformatory Unit. Plaintiff asserts in his complaint that his rights under federal and state law were violated by the manner in which Washington Department of Corrections ("DOC") staff at the Clallam Bay Corrections Center ("CBCC") and the MCC – Twin Rivers Unit ("TRU") handled his outgoing mail. (*See* Dkt. # 6 (Compl.).) Plaintiff identifies the following Defendants in his complaint: Stephen Sinclair, Secretary of the DOC; Eric Jackson, Superintendent of the MCC-TRU; Sergeant James Palmer, Supervisor of the MCC-TRU mailroom; Sergeant

REPORT AND RECOMMENDATION
PAGE - 1

Christopher Stone, Supervisor of the CBCC mailroom; Lori Schneider, MCC-TRU mailroom employee; and Cora Sasticum, CBCC mailroom employee. (*See id*. at 1, 3-9.) Plaintiff seeks declaratory and injunctive relief, and damages. (*Id*. at 25-26.)

Defendants have filed a motion for summary judgment seeking dismissal of all Plaintiff's claims with prejudice. (Dkt. # 19 (Motion).) Plaintiff has filed a response to Defendants' summary judgment motion (dkt. # 41 (Resp.)), and Defendants have filed a reply brief in support of their motion (dkt. # 44 (Reply)). The Court, having reviewed Plaintiff's complaint, Defendants' summary judgment motion, and the balance of the record, concludes that Defendants' motion should be granted with respect to Plaintiff's federal constitutional claims, and that Plaintiff's complaint and this action should be dismissed with prejudice as to those claims. This Court further concludes that Plaintiff's state law claims should be dismissed without prejudice.

## II.    BACKGROUND

Plaintiff has been in the custody of the DOC since 1994. (Compl. at 10.) According to Plaintiff, he has litigated numerous lawsuits against the DOC during the course of his confinement and has become a "well-known 'jailhouse lawyer.'" (*Id*.) Plaintiff claims that Defendants have engaged in a "pattern and practice" of retaliatory conduct against him because of his past litigation activities. (*Id*.) Plaintiff further claims that Defendants have censored his speech and expression for unjustified reasons. (*Id*.) Plaintiff identifies in his complaint three instances of alleged censorship of his outgoing mail, one of which involved the rejection of an outgoing piece of mail while Plaintiff was confined at CBCC in December 2017, and two of

REPORT AND RECOMMENDATION
PAGE - 2

which involved the restriction of outgoing JPay messages while Plaintiff was confined at MCC-TRU in December 2018. (*See id*. at 10-19.)

For offenders confined in DOC facilities, all incoming and outgoing mail is subject to inspection by DOC staff in accordance with DOC Policy 450.100. (*See* Dkt. # 20, Declaration of Christopher Stone (Stone Decl.) ¶ 5; Dkt. # 21, Declaration of Cora Sasticum (Sasticum Decl.) ¶ 1.) Whenever incoming or outgoing mail is rejected, mailroom employees are to provide written notice to the offender in accordance with DOC Policy 450.100. (Stone Decl. ¶ 6, Ex. 1 at pg. 9.) Pursuant to policy, rejections of outgoing mail are to be automatically reviewed by the Superintendent/designee of the facility. (*See id*.) Rejections that are upheld by the Superintendent/designee are to be automatically reviewed by the Correctional Manager at DOC Headquarters. (*See id*.)

On December 6, 2017, Defendant Sasticum, a mail processing driver at CBCC, inspected an outgoing piece of mail sent by Plaintiff and she rejected the mail because it appeared to violate DOC policy which restricts third-party contact. DOC Policy 450.100 III. F. ("Mail must contain only correspondence/property for the addressed individual(s). Correspondence/property for or from a third party is not permitted.") (Sasticum Decl. ¶ 4; Stone Decl., Ex. 1.)

The DOC restricts third-party mailings because such mailings present a risk to both the DOC and to the public. (*See* Stone Decl. ¶ 5.) Defendant Stone explains that the DOC must know the identity of the parties with whom an offender is corresponding in order to ensure that offenders are not attempting to contact others with whom correspondence is prohibited. (*Id*.) For example, many offenders are restricted from contacting minor children, victims of their crimes, or individuals who may have a no-contact order against a specific offender. (*Id*.) Offenders are

REPORT AND RECOMMENDATION
PAGE - 3

also prohibited from exchanging correspondence with other offenders unless such correspondence has been previously authorized by DOC officials. (*Id*.) Outgoing mail containing correspondence for a third-party prevents the DOC from readily identifying the true recipient of the correspondence. (*Id*.) Absent such information, the DOC cannot determine whether the correspondence violates court orders or DOC policies and, thus, such correspondence presents a safety and security concern. (*Id*.)

With respect to the piece of mail rejected by Defendant Sasticum in December 2017, Defendant Sasticum explains that though she doesn't specifically recall the inspection and rejection of Plaintiff's mail, her review of the records associated with the mail item led her to the conclusion that the mail likely drew her attention because the first line of the address contained the name "CAUSERIE PUBLISHING," and the second line of the address identified what appeared to be a separate addressee as it read "C/o Ms. MagdElena." (Sasticum Decl. ¶ 4; Stone Decl., Ex. 3.) This appeared to Defendant Sasticum to violate DOC policy prohibiting third-party communications. (Sasticum Decl. ¶ 4.) Defendant Sasticum also noted that the physical address provided, "173 16th Avenue, Seattle, WA. 98122," appeared to be a residential address and not a commercial address as would be expected if the mail was being sent to a publisher. (*See id*.) Defendant Sasticum determined that because Plaintiff was attempting to mail an item to a third-party, the mail should be rejected in accordance with DOC Policy 450.100. (Sasticum Decl. ¶ 5.)

Following Defendant Sasticum's rejection of Plaintiff's outgoing mail, Defendant Stone, the mailroom sergeant at CBCC, automatically reviewed the rejection as the Superintendent designee. (Stone Decl. ¶¶ 7-8.) Defendant Stone indicates that, like Defendant Sasticum, he does not specifically recall the mail rejection at issue here. (*Id*. ¶ 8.) He states, however, that his

REPORT AND RECOMMENDATION
PAGE - 4

normal process in reviewing such a rejection would be to review the mail rejection notice and the mail item at issue, and then conduct his own research. (*Id.*) He further states that his research in such an instance would include searches of public databases and information in an attempt to confirm whether the address on the envelope belongs to the addressee on the envelope. (*Id.*) If he is unable to confirm that the address belongs to the addressee, or finds evidence indicating the address and the addressee does not match, he upholds the rejection. (*Id.*) In this instance, after researching the address and addressee on Plaintiff's rejected mail, he concurred with Defendant Sasticum's rejection of the mail item. (*Id.*, ¶ 8, Ex. 2.)

On December 13, 2017, the Correctional Manager at DOC Headquarters reviewed the outgoing mail at issue and likewise concurred with Defendant Sasticum's decision, explaining "Third party correspondence is unauthorized per DOC Policy 450.100, Section III.F. The intended recipient's address is not listed as Causerie Publishing." (*See* Stone Decl. ¶ 9, Ex. 2.)

On December 17, 2017, Plaintiff directed a kite to Defendant Stone in which he advised Defendant that he was appealing the mail rejection. (*Id.* ¶ 10, Ex. 3.) Plaintiff also requested that the piece of mail at issue be kept "'SECURE,' and SAFEGUARDED until the appeals process, and any possible Civil Rights Action is completed." (*Id.*) Defendant Stone responded on December 21, 2017, advising Plaintiff that outgoing mail is automatically appealed. (*Id.*)

On January 10, 2018, Plaintiff directed a second kite to Defendant Stone regarding the rejected mail. (Stone Decl. ¶ 11, Ex. 3.) Plaintiff indicated a desire to meet with Defendant Stone about the mail rejection, writing "What Sasticum, and your office did not know, is that during the time of the rejection, the CAUSERIE PUBLISHING OFFICE had moved, and had a different address." (*Id.*) Plaintiff continued, "This office is now at: 'The address listed on the Outgoing

REPORT AND RECOMMENDATION
PAGE - 5

1  Mail Rejection.'" (*Id*.) Plaintiff also once again asked that the rejected mail be preserved for use

2  as evidence in a civil rights action. (*Id*.) Defendant Stone responded on January 12, 2018,

3  advising Plaintiff that outgoing mail rejections are held for two years. (*Id*.) According to

4  Plaintiff, the requested meeting never took place. (Resp. at 6.)

5        Plaintiff asserts in his complaint that he exchanged correspondence with Causerie

6  Publishing multiple times in the six months preceding the mail rejection, and that the mailroom

7  staff, which examines all incoming mail, would therefore have known that he was working with

8  an editor to publish an article regarding his experiences within the DOC. (Compl. at 10-11.)

9  Plaintiff also asserts that the mailroom staff should have known that Causerie Publishing had

10  changed its address because a letter sent to Plaintiff by Causerie Publishing, and received in the

11  CBCC mailroom on or about November 6, 2017, provided notice of the change. (*See id*.)

12  Plaintiff suggests that though aware of the new address, Defendants chose to ignore it so they

13  would have justification for rejecting Plaintiff's subsequent December 2017 mail which

14  contained an "opinion article" critical of the DOC and its employees. (*See id*. at 12-14.) Plaintiff

15  maintains that the mail rejection was used as a mechanism to prevent the article from being

16  published and that it therefore constituted censorship by Defendants and violated his rights under

17  the First Amendment. (*Id*. at 14.)

18        In May 2018, plaintiff was transferred from CBCC to the MCC-TRU. (*Id*. at 16.)

19  Between May and November 2018, Plaintiff sent emails to his brother through the DOC's JPay

20  message system in which he detailed his ongoing litigation against the DOC.[1] (*Id*.) He was

21

22      [1] JPay, Inc. is a private company with which the DOC contracts to provide an electronic message service
   to offenders. (Dkt. # 23, Declaration of Tracy Schneider (T. Schneider Decl.) ¶ 4.) The JPay system

23  allows a registered user to send an electronic message to another registered user and thereby provides

REPORT AND RECOMMENDATION
PAGE - 6

thereafter invited to forward sample "scripts" to his brother for his brother's "radio-blog-talk-show entitled, 'From-Insideout.'" (*Id.*) According to Plaintiff, after sending out nine emails containing these "scripts," the wireless signal for his JPay mini-media device began to malfunction. (Resp. at 9-10. *See also* Compl. at 16-17.) Plaintiff claims that his wireless software was intentionally interfered with after Defendants at MCC-TRU became aware of the "Anti-DOC-Scripts." (*See id.*)

Thereafter, in December 2018, Plaintiff attempted on two occasions to email "pencil-art" to his brother through the JPay system and on both occasions the picture of the artwork, which was attached to the text of an email, was rejected. (Compl. at 17-19.) According to Plaintiff, the artwork in question was a drawing depicting censorship. (*Id.* at 17-18.) On December 25, 2018, Plaintiff sent an outgoing JPay message (Letter ID 527169423) which contained a short, typed message and an attached picture of an inmate holding a pencil-art drawing up to the camera. (T. Schneider Decl. ¶ 5.) Pursuant to MCC Operational Memorandum (OM) 540.105, inmates are prohibited from including props and/or hobby craft items in their pictures. (*See* Dkt. # 24, Declaration of Lori Schneider (L. Schneider Decl.) ¶ 4; Dkt. # 22, Declaration of Michael Hathaway (Hathaway Decl.) ¶ 7.)

The message was reviewed by MCC mailroom staff member Tammy O'Reilly who released the typed portion of Plaintiff's message to the recipient but restricted the picture from being released. (T. Schneider Decl. ¶ 5). Plaintiff was notified of the mail rejection on January

offenders an opportunity to communicate with individuals in the community. (*Id.*) JPay messages are processed and screened in accordance with DOC Policy 450.100. (*Id.*) Mailroom staff have the ability to restrict any given message or to release the message to the recipient. (*Id.*) If mailroom staff discover content that is prohibited by DOC Policy, the staff member restricts the message from being received by the designated recipient. (*Id.*)

REPORT AND RECOMMENDATION
PAGE - 7

11, 2019 via a message to his JPay account. (*See id.*, ¶ 5, Ex. 2.) TRU Correctional Program Manager Michael Hathaway conducted the facility review of the rejection and Plaintiff was notified on March 5, 2019 that the rejection of the image attached to the message had been upheld on the grounds that, under OM 540.105, no props are allowed in photos. (*Id*. ¶ 5, Ex. 3; Hathaway Decl. ¶ 8, Ex. 2.) There is no indication in the record that the rejection of Plaintiff's December 25, 2018 JPay message was ever reviewed by DOC Headquarters after the facility review was completed.

On December 27, 2018, Plaintiff sent another JPay message (Letter ID 527922121) similar to the one he had sent two days prior. Once again, the email included a short, typed message and an attached photo of an inmate holding a pencil-art drawing.[2] (T. Schneider Decl. ¶ 6; L. Schneider Decl. ¶ 4.) This second message was reviewed by Defendant Lori Schneider, a mail processing driver at MCC, who restricted the message, apparently in its entirety, because it contained a drawing. (L. Schneider Decl. ¶¶ 2, 4; T. Schneider Decl., Ex. 4.) Plaintiff received notice of the restriction through JPay on December 28, 2018. (Decl. of T. Schneider ¶ 6, Ex. 4.) On January 14, 2019, Plaintiff was notified that DOC Headquarters had reviewed the outgoing JPay message and concurred with the facility decision to reject the message. (*See* T. Schneider Decl. ¶ 6, Ex. 5.) There is no indication in the record that the rejection of Plaintiff's December 27, 2018 JPay message was ever reviewed by the facility Superintendent/designee before being reviewed and rejected by DOC headquarters.

---

[2] According to Plaintiff, the drawing included in the second message was a "more detailed" version of the drawing he had originally attempted to send. (Compl. at 19.)

REPORT AND RECOMMENDATION
PAGE - 8

While Plaintiff complains that the drawings he attempted to send out of TRU on December 25, 2018 and December 27, 2018 were improperly "censored," he also complains that there is no rule or policy prohibiting a photo of a drawing from being emailed out of the facility, and that he did not receive proper notice of the rejections. (Compl. at 17-19.) These complaints appear to implicate Plaintiff's First Amendment rights and his right to due process.

## III.   DISCUSSION

### A.   Applicable Standards

#### 1.   *Summary Judgment Standard*

Summary judgment is appropriate when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party bears the initial burden of showing the district court "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. The moving party can carry its initial burden by producing affirmative evidence that negates an essential element of the nonmovant's case, or by establishing that the nonmovant lacks the quantum of evidence needed to satisfy its burden of persuasion at trial. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc*., 210 F.3d 1099, 1102 (9th Cir. 2000). The burden then shifts to the nonmoving party to establish a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must draw all reasonable inferences in favor of the nonmoving party. *Id*. at 585-87.

REPORT AND RECOMMENDATION
PAGE - 9

In supporting a factual position, a party must "cit[e] to particular parts of materials in the record . . .; or show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 585. "[T]he requirement is that there be no *genuine* issue of material fact. . . . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

The opposing party must present significant and probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient[]" to defeat summary judgment. *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). Nor can the nonmoving party "defeat summary judgment with allegations in the complaint, or with unsupported conjecture or conclusory statements." *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).

### 2.    *Section 1983 Standard*

In order to sustain a cause of action under 42 U.S.C. § 1983, a plaintiff must show (i) that he suffered a violation of rights protected by the Constitution or created by federal statute, and (ii) that the violation was proximately caused by a person acting under color of state law. *See*

REPORT AND RECOMMENDATION
PAGE - 10

*Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). The causation requirement of § 1983 is satisfied only if a plaintiff demonstrates that a defendant did an affirmative act, participated in another's affirmative act, or omitted to perform an act which he was legally required to do that caused the deprivation complained of. *Arnold v. IBM*, 637 F.2d 1350, 1355 (9th Cir. 1981) (citing *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978)).

**B.    Analysis**

*1.    First Amendment – Rejected Outgoing Mail*

It is well established that a convicted prisoner does not forfeit all constitutional protections as a result of his confinement. *Bell v. Wolfish*, 441 U.S. 520, 545 (1979). However, those rights may, of necessity, be restricted in the prison context. *Id.* at 545-46. The Supreme Court has specifically recognized that inmates enjoy a First Amendment right to send and receive mail. *See Thornburgh v. Abbott*, 490 U.S 401 (1989). It has also recognized that "the legitimate governmental interest in the order and security of penal institutions justifies the imposition of certain restraints on inmate correspondence." *Procunier v. Martinez*, 416 U.S. 396, 413 (1974), *overruled on other grounds by Thornburgh*, 490 U.S. at 413-14.

The Supreme Court, in *Martinez*, established a standard for evaluating First Amendment claims concerning outgoing correspondence sent by prisoners. *Martinez*, 416 U.S. at 412-13. Under that standard, censorship of prisoner mail is justified only if "the regulation or practice in question [ ] further[s] an important or substantial governmental interest unrelated to the suppression of expression," and "the limitation of First Amendment freedoms [is] no greater than is necessary or essential to the protection of the particular governmental interest involved." *Martinez*, 416 U.S. at 413.

REPORT AND RECOMMENDATION
PAGE - 11

i.    CBCC Mail Rejection – December 2017

Plaintiff first challenges the rejection of a piece of his outgoing mail at CBCC in December 2017. The mail in question was rejected by Defendant Sasticum as unauthorized third-party correspondence and that decision was upheld by both Defendant Stone and DOC Headquarters Correctional Manager Roy Gonzalez. (*See* Stone Decl., Ex. 2.) Plaintiff does not appear to challenge the constitutionality of the policy prohibiting third-party correspondence but, instead, challenges Defendants' application of that policy to the mail rejected by CBCC mailroom staff in December 2017.

Plaintiff argues that the mail in question did not constitute a third-party mailing because the editor to whom it was directed was not a third-party. (*See* Compl at 14.) Plaintiff cites to a number of pieces of correspondence he exchanged with Causerie Publishing and it's editor, Magdelena Simpson, in the months preceding the mail rejection and suggests that Defendants should have been aware that he was working on an article with Causerie Publishing and Ms. Simpson given that DOC policy requires mailroom staff to examine all incoming mail. (*Id*. at 11-13.) Plaintiff further suggests that Defendants should have been aware that Causerie Publishing had changed its address, given that Ms. Simpson had sent Plaintiff a letter notifying him of the change, and that Defendants should therefore have known that the address on the rejected item was correct. (*See id*. at 10-11.) Plaintiff appears to believe that Defendants should have updated their records to reflect the change and suggests that their failure to do so was perhaps intentional.[3] (*Id*. at 11-12.) Plaintiff ultimately concludes that Defendants used the third-party

---

[3] Plaintiff incorrectly presumes that the DOC and/or individual facilities maintain records of such addresses. Defendant Stone states in his declaration in support of Defendants' summary judgment motion that the CBCC mailroom receives 400 to 500 pieces of incoming and outgoing mail per day, and that the

REPORT AND RECOMMENDATION
PAGE - 12

address restriction as a pretense to reject his outgoing mail because the mail contained an article which was highly critical of the DOC and its employees, and that their actual intent was to censor his speech. (*See id*. at 12-14.)

Defendants, however, have provided sufficient evidence that the mail in question was rejected in accordance with DOC policy restricting third-party mailings. Plaintiff's rejected mail was addressed to both a company, Causerie Publishing, and to an individual, "Ms. Magdelena." Plaintiff's suggestion that the CBCC mailroom staff should have known from Plaintiff's prior correspondence that Causerie Publishing and Ms. Magdelena were essentially one and the same ignores the sheer volume of mail that mailroom staff process on a daily basis. (*See* Stone Decl. ¶ 13.) Defendant Stone specifically states that he had no knowledge of any prior communications between Plaintiff and Causerie Publishing, and Defendant Sasticum simply states that she was not familiar with Plaintiff at the time of the mail rejection. Plaintiff offers no evidence to the contrary which undermines his contention that Defendants motives in rejecting the mail are suspect.

The record also demonstrates that CBCC staff were unable to confirm that that the address provided on the envelope belonged to the addressee(s). As Defendant Stone explains, the DOC must be able to readily discern the identity of the parties with whom an offender is corresponding in order to ensure that offenders are not attempting to contact those with whom correspondence is prohibited. (Stone Decl. ¶ 5.) Plaintiff calls into question the thoroughness of the search conducted by Defendants to confirm the address, noting that he had the address

---

mailroom does not track or store addresses, nor does it track addresses changes when they are sent to offenders. (Stone Decl. ¶ 13; Sasticum Decl. ¶ 8.)

REPORT AND RECOMMENDATION
PAGE - 13

researched online and was able to confirm that the address was legitimate. (Resp. at 28.) Plaintiff submitted in support of his response brief copies of the results of the online search conducted for him, apparently by his brother, but those materials appear to show nothing more than that the address in question exists. (Dkt. # 40, Plaintiff's Exhibits – Part 1 (Pltf. Ex. Pt. 1) at 260-263.) Plaintiff's materials do not show that the address is connected to Causerie Publishing presently and, more relevant for present purposes, the do not show that the address was connected to Causerie Publishing at the time Plaintiff's mail was rejected.

In sum, Plaintiff fails to demonstrate that his mail was improperly rejected as a third-party mailing, and he offers nothing more than speculation and conclusory assertions to support his suggestion that the mail was rejected in an attempt to preclude Plaintiff's "opinion article" from being released to the public. The Court is satisfied Defendants' rejection of the mailing in question did not violate Plaintiff's First Amendment rights. Defendants are therefore entitled to summary judgment with respect to this claim.

ii.    MCC-TRU Mail Rejections – December 2018

Plaintiff also challenges the rejection of two outgoing JPay messages at MCC-TRU in December 2018. Both messages were sent to Plaintiff's brother, and both included an attachment in the form of a photograph of Plaintiff holding a pencil drawing. (Compl. at 17-19.) The messages were rejected on the grounds that the attached photograph contained a prop; *i.e.*, Plaintiff's "pencil-art." (*See id*.)

Plaintiff argues that there was no DOC policy prohibiting a photo of a drawing from being emailed out of the facility to his family at the time his JPay messages were restricted, and he suggests that the photo was actually rejected because the drawing was critical of the DOC

REPORT AND RECOMMENDATION
PAGE - 14

and/or its employees. Plaintiff notes that DOC Policy 450.100 Section III.D. specifically prohibits the censoring of opinions critical of the Department policy or personnel which is what he believes happened in his case. (*See* Compl. at 18-19.) Plaintiff asserts that the restriction of his JPay messages amounted to unconstitutional censorship. (*See id*. at 5-7, 17-19.)

The record makes clear that there is indeed a policy at MCC that prohibits a photo containing a prop from being mailed out of the facility. Pursuant to MCC OM 540.105, Attachment 1, Revision 9/14, inmates are prohibited from including props and hobby craft items in their pictures. (Decl. of L. Schneider ¶ 4.) According to Defendants, the provision of OM 540.105, Rev. 9/14, which prohibits the use of props in photographs is intended to prevent inmates from bringing items that are permitted in one part of the facility to areas of the facility where the items are not permitted. (Decl. of Hathaway ¶ 7.) Defendants explain that the prohibition on props in photographs also aids MCC staff in enforcing the Washington Administrative Code ("WAC"), specifically WAC 137-25-030(714) which prohibits inmates from giving, lending, borrowing or trading items to/with others. (*Id*.) Defendants further explain that enforcement of OM 540-105 provides inmates the opportunity to take and share photographs while maintaining the safety and security of the facility. (*Id*.)

The restriction on the use of props in photographs was being enforced at MCC at the time Plaintiff's pictures were rejected, and it continues to be enforced today, despite the fact that OM 540.105 was revised in June 2018 and Attachment 1 to the revised policy, which sets forth procedures and rules governing photos, does not include a restriction on the use of props as did Attachment 1 to Rev. 9/14 (provision # 8). (*See* Decl. of Hathaway ¶¶ 3-6, Ex. 1.) Because OM 540.105, Rev. 9/14, continues to be enforced at MCC as a local rule, the photographs would have

REPORT AND RECOMMENDATION
PAGE - 15

1   been properly rejected under DOC Policy 450.100, Rejection Reason # 1, which provides that

2   any mail "[n]ot specifically authorized by Department policy or facility procedures" may be

3   rejected. (*See* Decl. of T. Schneider, Ex. 1, Attachment 1. *See also* Dkt. # 40-1, Plaintiff's

4   Exhibits – Part 2 (Pltf. Ex. Pt. 2) at 195.)

5       Plaintiff's JPay messages containing props were properly restricted in accordance with

6   DOC policy and MCC institutional policy, and the restrictions were properly upheld. Once again,

7   Plaintiff offers nothing more than speculation and conclusory assertions to support his claim that

8   the intent of the mail rejection was to censor his speech and expression. Defendants are therefore

9   entitled to summary judgment with respect to this portion of Plaintiff's First Amendment mail

10  rejection claim as well.

11              *2.      First Amendment - Retaliation*

12      Plaintiff alleges, in the portion of his statement of material facts detailing his "history

13  while incarcerated," that Defendants have retaliated against him because of his known history of

14  litigating against the DOC and his known animosity towards DOC officials. (Compl. at 10.)

15  Plaintiff provides additional information regarding his litigation activities later in his statement

16  of facts (*see id*. at 15-16), though Plaintiff at no point elaborates on his retaliation claim nor does

17  he specifically allege a claim for retaliation in Section VI of his complaint, the portion of the

18  complaint in which he identifies his claims for relief.[4]

19

20  [4] Notably, Plaintiff also fails to specifically allege in Section VI of his complaint his First Amendment

21  claims pertaining to the rejection and alleged censorship of his outgoing mail. It is possible, though not
    entirely clear, that Plaintiff intended his First Amendment claims to be subsumed within his first claim for
    relief in which he generically alleges a violation of § 1983. However, it is well established that §1983

22  itself creates no substantive rights, and that it merely provides a remedy for deprivation of federal rights
    established elsewhere. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985). Thus, Plaintiff's first

23  claim, as set forth in his complaint, actually states no cognizable ground for relief. However, the Court

Defendants, in their summary judgment motion, address Plaintiff's apparent retaliation claim, arguing that Plaintiff's allegations are conclusory and without factual support. (Motion at 12-13.) Plaintiff, in his response to Defendants' motion, maintains that he has a viable retaliation claim, once again relying primarily on his history of litigation against the DOC and its employees during his 26 years of incarceration. (Resp. at 37-41.) Because the issue has been briefed by the parties, the Court will address it.

A viable claim of First Amendment retaliation within the prison context has five basic elements: "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2005).

In order to prevail on a retaliation claim, "a plaintiff must show that his protected conduct was the substantial or motivating factor behind the defendant's conduct." *Brodheim v. Cry*, 584 F.3d 1262, 1271 (9th Cir. 2009) (citation and internal quotation omitted). In addition, a plaintiff "bears the burden of pleading and proving the absence of legitimate correctional goals for the conduct of which he complains." *Pratt v. Rowland,* 65 F.3d 802, 806 (9th Cir. 1995). The Court evaluates a retaliation claim in light of the deference accorded prison officials. *Id*. at 807.

While Plaintiff asserts that Defendants' alleged improper conduct in relation to the handling of his mail was motivated by his prior litigation activities, he offers absolutely no evidence to support the assertion. In fact, Defendants Sasticum and Schneider, the individuals

---

liberally construes the claim as asserting a violation of Plaintiff's First Amendment rights which are referenced elsewhere in Plaintiff's complaint.

REPORT AND RECOMMENDATION
PAGE - 17

who originally rejected Plaintiff's mail at CBCC and TRU, state that they were not even familiar with Plaintiff at the time of the mail rejections and Plaintiff offers no evidence to refute this. (*See* Decl. of Sasticum ¶ 3; Decl. of L. Schneider ¶ 4.) Moreover, as explained above, the rejection of Plaintiff's outgoing mail was consistent with DOC policy and there is an absence of any evidence that Defendants were motivated by an intent to censor Plaintiff's speech or expression. The evidence in the record instead supports the conclusion that Defendants' motivation in rejecting Plaintiff's mail was to uphold and enforce DOC and institutional policies.

To the extent Plaintiff intends to claim that the MCC-TRU Defendants retaliated against him by interfering with the wireless connection and/or software on his personal JPay tablet after he began sending emails to his brother which included content highly critical of the DOC and its employees, his claim also lacks evidentiary support. (Compl. at 16-17.) Plaintiff asserts that because the DOC has a contract with JPay, Defendants have access to and the ability to interfere with the JPay software. (*Id*. at 17.) However, Plaintiff presents no evidence demonstrating that the MCC-TRU Defendants in this case had the ability, much less the inclination, to interfere with either Plaintiff's wireless connection or the JPay software on his personal device. The fact that members of the mailroom staff have the ability to monitor messages sent by offenders through the JPay system, and reject those that do not comport with policy, does not translate into an ability to interfere with the more technical aspects of the electronic messaging system. In sum, Plaintiff's retaliation claim is based upon mere speculation and is therefore insufficient to establish a First Amendment violation.

3.    *Due Process*

Plaintiff alleges that Defendants violated his federal due process rights when they failed to provide adequate notice/process in relation to the rejection of his outgoing mail and JPay messages. (Compl. at 22.) He alleges as well that Defendants violated his procedural and substantive due process rights when they withheld his mail and JPay messages and failed to return them. (*Id.* at 23.)

The Due Process Clause of the Fourteenth Amendment confers both procedural and substantive rights. *See Armendariz v. Penman*, 75 F.3d 1311, 1318 (9th Cir. 1996). A § 1983 claim based upon procedural due process has three elements: (1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; and, (3) lack of process. *Portman v. County of Santa Clara*, 995 F.2d 898 (9th Cir. 1993). The substantive component of the Due Process Clause protects individuals from the arbitrary deprivation of their liberty by government. *County of Sacramento v. Lewis*, 523 U.S. 833, 845-49 (1998). However, "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'" *Id.* at 846 (citing, *Collins v. Harker Heights*, 503 U.S. 115, 129 (1992). The Supreme Court has identified the cognizable level of executive abuse of power as "that which shocks the conscience." *Id.* The Supreme Court has also made clear that "the protections of the Due Process Clause, whether procedural or substantive, are just not triggered by lack of due care by prison officials." *Davidson v. Cannon*, 474 U.S. 344, 348 (1986). This is so even if the lack of due care resulted in serious injury. *See id.* at 347-48.

REPORT AND RECOMMENDATION
PAGE - 19

i.      Inadequate Notice/Process

Plaintiff alleges that he received inadequate notice and process in relation to both the

rejection of his regular mail at CBCC and the rejection of his JPay messages at MCC-TRU. (*See*

Compl. at 22.) However, the factual allegations in Plaintiff's complaint and in his response to

Defendants' summary judgment motion appear to focus primarily on the rejection of his JPay

messages. In particular, Plaintiff complains that he was not provided timely notice of the

rejections, that he was not provided sufficient justification for the rejections, and that he was not

afforded the two-part review process established by DOC Policy 450.100 entailing both an

automatic facility level review of rejected outgoing mail as well as an automatic headquarters

review of the rejection. (*See* Compl. at 18-19; Resp. at 12-19.)

The Supreme Court has made clear that prisoners and their correspondents have a liberty

interest in uncensored communication by letter, though the interest is necessarily qualified by the

fact of imprisonment, and that the interest is protected from arbitrary governmental intrusion.

*Martinez*, 416 U.S. at 418. Accordingly, "the decision to censor or withhold delivery of a

particular letter must be accompanied by minimum procedural safeguards." *Id*. at 417. Minimal

procedural safeguards in this context require that an inmate be notified that his mail has been

rejected, that the inmate be given "a reasonable opportunity to protest that decision," and that

any appeal of the decision be referred to someone other than the person who initially rejected the

mail. *Id*. at 418-19.

Plaintiff's arguments in relation to the adequacy of the notices he received with respect to

his rejected mail and to the adequacy of the review process appear to focus primarily on whether

Defendants' actions comported with DOC policy. However, whether or not the process Plaintiff

REPORT AND RECOMMENDATION
PAGE - 20

was afforded comported with DOC policy is not the relevant question. The relevant question is whether Plaintiff received minimum procedural safeguards. The record confirms that Plaintiff received notification of the rejections, that the rejections proceeded through an automatic appeal process, and that the original decisions were reviewed by at least one person other than the person who originally rejected the message. It is notable as well that, while DOC policy has a built-in appeal process for the rejection of outgoing mail, Plaintiff was also permitted to challenge alleged deficiencies in that process through the DOC grievance process. (*See* Pltf. Ex. Pt. 2 at 12-29.)

It is clear from the record that there were some deficiencies in the way the review process functioned in relation to the rejection of Plaintiff's JPay messages as some of the notifications were, in fact, delayed and each of the rejections appears to have been reviewed at only one level following the rejection. (*See id*. at 12-29, 195-196.) The first JPay rejection was reviewed at the facility level and not at the headquarters level, and the second JPay rejection was reviewed at the headquarters level but nothing in the record suggests that it was reviewed at the facility level. However, the minimal due process requirements were met and, in any event, nothing in the record suggests that the deficiencies in the JPay message rejection and review process were attributable to anything more than a lack of due care by prison officials which is insufficient to trigger due process protections. *Davidson*, 474 U.S. at 348. Accordingly, Defendants are entitled to summary judgment with respect to Plaintiff's claims challenging the adequacy of the process employed in the rejection of his mail and JPay messages.

REPORT AND RECOMMENDATION
PAGE - 21

1

        ii.    Deprivation of Property

2

    Plaintiff also alleges that Defendants violated his procedural and substantive due process

3

rights when they confiscated and failed to return his "intellectual property," apparently including

4

the opinion article he had attempted to send to Causerie Publishing for publication and the

5

pictures of his drawings that he attempted to send to his brother through the JPay system. (*See*

6

Compl. at 23.) However, to the extent Plaintiff claims that Defendants intentionally and

7

improperly deprived him of his personal property, he has not alleged any viable claim for relief.

8

    Where a state employee's random, unauthorized act deprives an individual of property,

9

either negligently or intentionally, the individual is relegated to his state post-deprivation

10

process, so long as the state provides an adequate post-deprivation remedy. *Hudson v. Palmer*,

11

468 U.S. 517, 533 (1984); *Parratt v. Taylor*, 451 U.S. 527, 540-41 (1981), *overruled on other*

12

*grounds by Daniels v. Williams*, 474 U.S. 327 (1986). Washington State provides a post-

13

deprivation remedy for the alleged tortious conduct of state employees under RCW 4.92. Thus,

14

any claims pertaining to the loss of Plaintiff's personal property are not cognizable in this action.

15

Defendants are therefore entitled to summary judgment with respect this portion of Plaintiff's

16

due process claim.

17

        4.    *Takings Clause*

18

    In addition to his claim that the confiscation of his artwork and his opinion articles

19

violated his due process rights, Plaintiff also claims that the withholding of those items without

20

compensation violates the Takings Clause of the United States Constitution. (Compl. at 23-24.)

21

The Takings Clause of the Fifth Amendment provides that "private property [shall not] be taken

22

for public use, without just compensation." U.S. Const. V. The Takings Clause applies to the

23

REPORT AND RECOMMENDATION
PAGE - 22

States through the Due Process Clause of the Fourteenth Amendment. *Schneider v. California Dept. of Corrections*, 151 F.3d 1194, 1198 (1998). Plaintiff does not allege that Defendants took his property and converted it to public use, he merely alleges that they took the property without compensation. This allegation is insufficient to state a claim under the Takings Clause and Defendants are therefore entitled to summary judgment with respect to that claim.

### 5.    *Personal Participation*

Defendants argue in their motion for summary judgment that Plaintiff's claims against Defendants Stephen Sinclair, Eric Jackson, and Sergeant Palmer should be dismissed because Plaintiff has not sufficiently alleged personal participation on the part of these three Defendants. (Motion at 16-17.) As Defendants correctly note, the manner in which Plaintiff describes his claims against Defendants Sinclair, Jackson, and Palmer suggests that Plaintiff is attempting to have these individuals held liable based on their supervisory positions. (*See* Compl. at 3-6.) The Supreme Court has made clear that a defendant cannot be held liable under § 1983 solely on the basis of supervisory responsibility or position. *Monell v. Department of Social Servs., of City of New York*, 436 U.S. 658, 691–94 (1978). Rather, a plaintiff must allege that a defendant's own conduct violated the plaintiff's civil rights. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385–90 (1989). "A supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations or knew of the violations and failed to act to prevent them." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (citing *Ybarra v. Reno Thunderbird Mobile Home Village*, 723 F.2d 675, 680-81 (9th Cir. 1984)).

The Court concurs that Plaintiff's complaint is devoid of any specific factual allegations showing that Defendants Sinclair, Jackson, or Palmer personally participated in the deprivation

REPORT AND RECOMMENDATION
PAGE - 23

of any of Plaintiff's constitutionally protected rights. Moreover, as explained in detail above, Plaintiff has not demonstrated any violation of his federal constitutional rights related to the rejection of his mail/JPay messages. Accordingly, Defendants Sinclair, Jackson, and Palmer should be dismissed from this action.

### 6.    Eleventh Amendment

Defendants also argue in their summary judgment motion that, to the extent Plaintiff alleges claims against the DOC, the Eleventh Amendment bars such claims. (Motion at 8-9.) In his complaint, Plaintiff did not clearly identify the DOC as a Defendant separate and apart from Defendant Sinclair, the Secretary of the DOC, and the Court therefore did not order service on the DOC. Thus, in this Court's view, the DOC itself is not a Defendant to this action. However, even assuming the DOC were to be deemed a Defendant to this action, any intended claims against this Defendants would be barred.

It is well established that, under the Eleventh Amendment, an unconsenting state is immune from suits brought in federal courts by its own citizens. *See Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974). The State of Washington has not waived its Eleventh Amendment immunity for suits such as the one presented here. *See Whiteside v. State of Washington*, 534 F. Supp. 774 (D.C. Wash. 1982). Because the DOC is an agency of the State of Washington, any intended claims against the DOC are essentially claims against the state itself and are therefore barred under the Eleventh Amendment. *See Regents of the University of California v. Doe*, 519 U.S. 425, 429-31 (1997). In addition, the Supreme Court has made clear that states and state agencies are not "persons" subject to suit under § 1983. *See Will v. Michigan Department of*

REPORT AND RECOMMENDATION
PAGE - 24

*State Police*, 491 U.S. 58 (1989). Thus, any intended claims against the DOC are also barred under *Will*.

### 7.   *Pendent State Law Claims*

In addition to the federal constitutional claims asserted by Plaintiff in his complaint, Plaintiff also asserts state law claims for theft and violation of his due process rights under the Washington State Constitution. (Compl. at 24-25.) The Supreme Court has stated that federal courts should refrain from exercising their pendent jurisdiction when the federal claims are dismissed before trial. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966). Because Plaintiff's federal constitutional claims are subject to dismissal based upon Plaintiff's failure to establish any violation of his federal constitutional rights, this Court should decline to exercise jurisdiction over Plaintiff's state law claims.

### 8.   *Defendants' Motion to Strike*

Defendants, in their reply brief, move to strike various factual allegations contained in Plaintiff's materials for which Plaintiff does not present any evidentiary support. (Reply at 2-3.) Defendants also move to strike Plaintiff's testimony and documents that are irrelevant, contain hearsay evidence, or are otherwise inadmissible. (*Id*. at 4.) It is indeed true that Plaintiff's submissions contain a multitude of unsupported factual allegations, and that he has presented a number of documents in support of his claims that are irrelevant or would be otherwise inadmissible at trial. However, the Court has not relied upon any unsupported allegations or inadmissible evidence for substantive purposes in reaching its decision on Defendants' summary judgment motion, and the Court therefore declines to undertake the labor-intensive task of identifying and striking all objectionable content from Plaintiff's submissions.

REPORT AND RECOMMENDATION
PAGE - 25

## IV.    CONCLUSION

Based on the foregoing, this Court recommends that Defendants' motion for summary judgment (dkt. # 19) be granted with respect to Plaintiff's federal constitutional claims and that Plaintiff's complaint (dkt. # 6) and this action be dismissed with prejudice as to those claims. The Court further recommends that Plaintiff's complaint be dismissed without prejudice as to Plaintiff's state law claims. A proposed order accompanies this Report and Recommendation.

## V.    OBJECTIONS

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **twenty-one (21) days** of the date on which this Report and Recommendation is signed. Failure to file objections within the specified time may affect your right to appeal. Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed. Responses to objections may be filed within **fourteen (14) days** after service of objections. If no timely objections are filed, the matter will be ready for consideration by the District Judge on **October 23, 2020**.

DATED this 28th day of September, 2020.


MICHELLE L. PETERSON
United States Magistrate Judge

REPORT AND RECOMMENDATION
PAGE - 26